**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| SHARNALLE MITCHELL, LORENZO BROWN, TITO WILLIAMS, COURTNEY TUBBS, TEQUILA BALLARD, WILLIE WILLIAMS, THOMAS ELLIS, GAVIN BULLOCK, KENDRICK MAULL, TAMARA DUDLEY,JERMAINE TYLER, JANET EDWARDS, RISKO MCDANIEL, DEMETRI COLVIN, CARL WILLIAMS, RAYSHONE WILLIAMS, et al. | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE CITY OF MONTGOMERY, | ) ) |
| Defendant. | ) ) |

Case No. 2: 14-cv-186-MEF
(Class Action)

## FIRST AMENDED CLASS ACTION COMPLAINT

### Introduction

The Plaintiffs in this case are each impoverished people who were jailed by the City of Montgomery because they were unable to pay a debt owed to the City from traffic tickets. In each case, the City ordered the Plaintiff either to pay the City immediately or to "sit out" his or her debt in the City jail at a rate of $50 per day. Although the Plaintiffs pleaded that they were unable to pay due to their poverty, each was sent to jail for nonpayment and none was afforded the inquiry into their ability to pay that the United States Constitution and Alabama law require. Once locked in the City's jail, the Plaintiffs were told that they could reduce their time in jail by working off their debts for an additional $25 per day if they agreed to perform janitorial tasks assigned by City employees, including cleaning the offices of City employees, scrubbing feces and blood from jail floors, and wiping the jail bars inside their overcrowded cells.

The treatment of Sharnalle Mitchell, Lorenzo Brown, Tito Williams, Courtney Tubbs, and each of the other Plaintiffs reveals systemic illegality perpetrated by the City of Montgomery against some of its poorest people.  The City of Montgomery, as a matter of policy and practice, engages in the same conduct against many other human beings on a daily basis, unlawfully jailing people if they are too poor to pay debts from traffic tickets and the associated fees, costs, and surcharges that the City increasingly levies.

By and through their attorneys and on behalf of themselves and all others similarly situated, the Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the violations that they suffered, injunctive relief assuring that their rights will not be violated again, and a declaration that the City's conduct is unlawful.  In the year 2014, these practices have no place in our society.

## Nature of the Action[1]

1.      It is the policy and practice of the City of Montgomery to jail people when they cannot afford to pay debts owed to the City resulting from prior traffic tickets and other municipal cases without conducting any inquiry into the person's ability to pay and without considering alternatives to imprisonment as required by federal and Alabama law.

2.      It is the policy and practice of the City to jail indigent people for these debts without informing people of their right to counsel and without providing adequate counsel to represent them during the proceedings.

3.      It is the policy and practice of the City to hold prisoners in the City jail at a rate of $50 per day, "sitting out" their debts until the debts are extinguished.  It is the policy and practice of the City to tell inmates that their time in the City's jail will be reduced if they agree to "work

---

[1] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

off" their debts to the City while in jail by laboring at janitorial and other work for the City at a rate of $25 per day toward their debts.

4.    It is the policy and practice of the City of Montgomery to contract with a private for-profit corporation, Judicial Correction Services, Inc. ("JCS, Inc."), to perform what the City calls "probation" services, which consists of collecting City debts in exchange for fees added to the debts owed by people who cannot afford to pay their traffic ticket fees, costs, and surcharges immediately.  It is the policy and practice of the City of Montgomery to rely on the discretionary recommendations and factual representations of this private entity to make decisions about whether to arrest a person, what disposition to enter in a person's case, and whether to put the person on "probation" or to require immediate payment or jail despite the fact that the private entity has a significant personal financial stake in these judicial enforcement proceedings.

5.    Plaintiffs seek declaratory, injunctive, and compensatory relief.

### Jurisdiction and Venue

6.     This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1595, and 28 U.S.C. § 2201, *et seq*., and the Fourth, Sixth, Thirteenth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

### Parties

8.    Plaintiff Sharnalle Mitchell is a 23-year-old resident of Montgomery; Lorenzo Brown is a 58-year-old resident of Montgomery; Courtney Tubbs is a 23-year-old resident of Montgomery; Tito Williams is a 38-year-old resident of Montgomery; Tequila Ballard is a 33-year-old resident of Montgomery; Willie Williams is a 53-year-old resident of Montgomery; Thomas Ellis is a 52-year-old resident of Montgomery; Gavin Bullock is a 25-year-old resident

of Montgomery; Kendrick Maull is a 22-year-old resident of Montgomery; Tamara Dudley is a 23-year-old resident of Montgomery; Jermaine Tyler is a 27-year-old resident of Montgomery; Janet Edwards is a 58-year-old resident of Montgomery; Risko McDaniel is a 38-year-old resident of Montgomery; Demetri Colvin is a 21-year-old resident of Montgomery; Carl Williams is a 57-year-old resident of Montgomery; and Rayshone Williams is a 29-year-old resident of Montgomery.  These Named Plaintiffs represent themselves as individuals and a Class of similarly situated people all subject to the City's debt-collection scheme.

9.     Defendant City of Montgomery is a municipal corporation, organized under the laws of the State of Alabama, that operates the Montgomery City Jail and the Montgomery Municipal Court and that collects debts from unpaid fines, fees, costs, and surcharges arising out of traffic tickets and other cases in its Municipal Court.

## Factual Background

**A.     The Initial Plaintiffs' Imprisonment**

**i.     Plaintiff Sharnalle Mitchell**

10.     Sharnalle Mitchell is a 23-year-old woman and a mother of two children—a 1-year-old boy and a 4-year-old girl.  *See* Exhibit 1.

11.     On January 26, 2014, Montgomery City police officers came to Ms. Mitchell's home and arrested her because she owed the City money from traffic tickets issued in 2010. Officers took Ms. Mitchell away from her two children and brought her to the City jail.

12.     The next day, January 27, 2014, she was brought to the City court and was told that she would not be released from jail unless she could pay the total amount of the fines, costs, associated fees, and extra surcharges from her tickets, which she was told was now in excess of $4,500.  Ms. Mitchell told the City prosecutor and the court that she was too poor to pay.

13.    The City prosecutor and City judge did not make any inquiry into her ability to pay or into any alternatives to imprisonment as required by federal and Alabama law, and the City did not appoint her an attorney to represent her at the hearing. The City judge instead told Ms. Mitchell that she would have to "serve out" her fine at a rate of $50 per day in the City jail.[2]

14.    When Ms. Mitchell was taken back to the City jail, she was given a sheet of paper stating that her jail term had been reduced to 58 days "or" payment of $2,907.[3]  *See* Exhibit 2. Ms. Mitchell was also informed by jail guards that she could "work off" an additional $25 per day toward her debt to the City if she agreed to perform labor consisting of janitorial tasks, including cleaning floors and wiping jail bars.

15.    Desperate to get back to her young children, Ms. Mitchell accepted this work assignment on her first day in jail. Thereafter, she labored to clean the floors and jail bars as directed by City jail employees on as many occasions as she could.

16.    Attached to this Complaint is a photograph of Ms. Mitchell's initial desperate attempt to account for how much of her debt she "worked off" in this way, which she calculated by hand each night on the back of the piece of paper given to her by the City court so that she could determine when she could be released to her family.  *See* Exhibit 3.

17.    Prior to her jailing, Ms. Mitchell earned money from styling people's hair to support herself and her two children. Based on her estimated income in 2013, Ms. Mitchell and

---

[2] According to JCS, Inc., Ms. Mitchell was ineligible for the company's "probation" services because the company believed that she was not making reliable payments to the company when placed on "probation" in the past. The City policy is to check with JCS, Inc. prior to making a case decision and to rely on the company's discretion about whether to put someone on "probation" or not.

[3] The statements in court about the amount owed and the jail term to be served almost invariably differ from what debtors are told when they return upstairs to the jail. Typically, the jail term as announced by the judge is reduced, and some portion of the debt is reserved so that debtors, like Plaintiffs, are placed back on a "payment plan" when released. This practice ensures the City's ability to continue to hold hearings, to charge "supervision fees" and other charges through its clerk's office or the private "probation" provider responsible for collecting the debts.

her children were subsisting at about 33% below the federal poverty line.[4]  Because of her lack

of resources, Ms. Mitchell relies on the Supplemental Nutrition Assistance Program (SNAP or

"Food Stamps") and the Women, Infants, Children (WIC) program to feed her family.

18.     At the time she was jailed in 2014, Ms. Mitchell did not own a house, car,

financial instruments, or any other significant assets.  She had no bank account. She was

struggling to pay the utility bills and to provide clothes for her children.

### ii.     Plaintiff Lorenzo Brown

19.     Lorenzo Brown is a 58-year-old disabled Montgomery resident.  *See* Exhibit 5.

He was arrested early in the morning on January 24, 2014, when City police came to the

dilapidated boarding house in which he lives with a number of other impoverished people and

took him into custody for failure to pay court fines, fees, and surcharges arising from traffic

tickets issued in 2010.

20.     Mr. Brown was kept in jail for three days until January 27, 2014, when he was

brought to the City Court.  The City Court informed Mr. Brown that he would be released from

jail if he found someone to pay half of the total amount of his outstanding balance, a sum in

excess of $1,100 as reported to Mr. Brown.  Mr. Brown informed the court about his previous

drug addiction and his financial inability to pay the debt, and he asked the court for mercy.

21.     The court, without conducting any inquiry into Mr. Brown's ability to pay,

without providing Mr. Brown an attorney to represent him at the hearing, and without

---

[4] This number likely substantially overstates Ms. Mitchell's financial resources.  Ms. Mitchell estimates her 2013 revenue from hair styling at approximately $14,000.  Her actual earnings were far lower, however, because Ms. Mitchell is responsible for purchasing all of the equipment and supplies necessary for her work.  The federal poverty line for a family of three was $19,530 in 2013.  Ms. Mitchell had not worked for several weeks prior to her jailing. *See* Exhibit 1.

considering any alternatives to imprisonment, ordered him to serve 44 days in City jail, purportedly to "serve out" his $2,200 debt at a rate of $50 per day.[5]

22.      When Mr. Brown was brought back to the City jail, he was given paperwork informing him that he could be released after payment of $1,400 "or" 28 days in jail.  *See* Exhibit 6.  This document also stated that Mr. Brown could be released "upon payment of half."

23.      Mr. Brown depends on a monthly Social Security disability check for survival. He does not own a house, car, financial instruments, or any other significant assets.  He maintains a bank account to collect his disability check, but it usually has no more than a few dollars in it because he survives check-to-check.

24.      Mr. Brown suffers constant pain from a variety of ailments, including spinal problems, arthritis, pain and a lack of movement in his hands, and persistent joint pain.  As a result, he is not able to work consistently.

### iii.        Plaintiff Tito Williams

25.      Tito Williams is a 38-year-old father of two children who lives in Montgomery with his mother and his children.  *See*  Exhibit 8.

26.      Mr. Williams went to the City police station on January 26, 2014, after he learned that he had outstanding warrants for debt from unpaid traffic tickets.  Upon reporting to the police station, he was arrested and placed in the City jail (which physically connects to the police station).  He was kept overnight and brought before the City Court on January 27, 2014.

27.      The City prosecutor and the court informed Mr. Williams that he owed the City approximately $1,600 and asked him why he had not paid it.  Mr. Williams informed the court that he had no money to pay the City.  The judge, without conducting any inquiry into Mr.

---

[5] According to JCS, Inc., Mr. Brown was ineligible for the company's "probation" services in January 2014 because the company believed that he had not made reliable payments to the company in the past.

Williams's ability to pay and without considering any alternatives to imprisonment, ordered him jailed to serve out his debt at $50 per day.

28.    When Mr. Williams returned to the City jail, he was given paperwork that told him that he would be released if he paid $1,164 "or" served 23 days in jail.  *See* Exhibit 9.

29.    Mr. Williams was told by City jail employees that he could "work off" his debt and be released from confinement earlier at a rate of $25 credit toward his debts per day if he agreed to labor for the City while in jail, including performing janitorial tasks and serving food at the jail.  During Mr. Williams's first few days at the jail, several incidents involving another inmate led to a significant mess of blood and feces throughout an area of the jail.  City jail employees did not want to clean the mess themselves and offered extra labor credits to any inmate who agreed to clean the blood and feces.  Mr. Williams, desperate to get home to his family, agreed to clean the blood and feces from the jail floors on several occasions despite the extraordinary discomfort that the task brought him.[6]

30.    At the time of his jailing, Mr. Williams had very recently obtained employment for a few weeks, but he lost his job while he sat in the City jail for his traffic ticket debt.

### iv.    Plaintiff Courtney Tubbs

31.    Courtney Tubbs is a 23-year-old Montgomery resident who was incarcerated by the State of Alabama from 2010 until 2013 due to a state criminal conviction separate from any municipal debt.  Mr. Tubbs learned after his incarceration that he had been assessed traffic tickets by the City at the time of his 2010 arrest.  He had not been aware of the tickets prior to his state incarceration.  After his release, he also received a new traffic ticket in the summer of 2013.

---

[6] After his release, Mr. Williams did not receive the extra credit toward his debt as promised by the City.  Other inmates also participated in this task in addition to Mr. Williams.

32.     After his release from prison, Mr. Tubbs had trouble finding stable, significant employment to help him meet the basic necessities of life.  At the time of his jailing by the City for unpaid debts, he lived with his younger brother and his mother, who is legally blind and who relies on Mr. Tubbs to help take care of her.  He did not own a car, house, financial instruments, or any other significant assets.  He had no bank account.

33.     On January 25, 2014, while sitting on his front porch, Mr. Tubbs was arrested by City police.

34.     Two days later, on January 27, 2014, Mr. Tubbs was brought before the City judge, who asked Mr. Tubbs why he had not paid his debt.  Mr. Tubbs stated that he could not afford to pay.  The judge asked Mr. Tubbs if he could get money down to the court that day, and Mr. Tubbs said that he could not.  The court did not conduct an inquiry into Mr. Tubbs's ability to pay, did not provide him an attorney to represent him at the hearing, and did not consider alternatives to imprisonment.  Mr. Tubbs was ordered jailed unless and until he paid $626 "or" spent 12 days in jail.  *See*  Exhibit 11.

### B.     The Initial Plaintiffs' Release From City Jail

35.     On January 30, 2014, and January 31, 2014, with the assistance of present counsel, Ms. Mitchell, Mr. Brown, Mr. Williams, and Mr. Tubbs each filed petitions for emergency relief in the Montgomery County Circuit Court seeking their immediate release from confinement.  After conferring with the state court judge, counsel for the City and counsel for Plaintiffs agreed on a course of action to obtain the release of the Plaintiffs, to subsequently drop the emergency petitions for release from jail as moot, and to litigate the issues raised by the City's treatment of the Plaintiffs in federal court.

36.     According to this agreement and following a similar procedure to that taken by the City in two similar suits (2013-cv-732-MEF and 2013-cv-733-MEF), counsel for Plaintiff was to file Notices of Appeal in Municipal Court objecting to the orders of incarceration for the inability to pay debts, and the Plaintiffs would be subsequently released from the City jail.

37.     Mr. Tubbs was released by the City on February 5, 2014, having served out the entirety of his debt.  Mr. Williams was released on February 7, 2014, and told by the City to pay the remainder of his debts by May 6, 2014.  *See* Exhibit 10.  Ms. Mitchell and Mr. Brown were each released on February 10, 2014, and the City has ordered them to pay the City $100 and $150 per month respectively or risk re-imprisonment.[7]  *See* Exhibits 4, 7.

38.     Plaintiffs Mitchell, Brown, and Williams thus continue to owe the City debts relating to fines, fees, costs, and extra unknown surcharges from traffic cases that were long ago resolved.[8]  They remain impoverished and struggling to provide for themselves and their families.  *See* Exhibits 1, 5, 8.  When they are again unable to afford the payments required by the City, they will again be subject to the same unconstitutional treatment pursuant to the City's ongoing policies and practices.  They thus suffer an ongoing fear of imminent imprisonment based on the City's policies and practices with respect to municipal debt collection.

**C.     Named Plaintiffs Added in the First Amended Complaint**

**i.     Plaintiff Tequila Ballard**

---

[7] After the Notices of Appeal were filed as agreed, the Municipal Court notified Plaintiffs' counsel that, pursuant to policy, it intended to charge Ms. Mitchell and Mr. Brown appellate bonds of $500 for each of their tickets for the right to appeal the order jailing them, meaning that Ms. Mitchell would be charged $9,000 and Mr. Brown $5,000 for the right to appeal.  Counsel requested an indigency hearing for the purpose of proceeding in forma pauperis with the Notices of Appeal.  On the date of that hearing, the Court cancelled the previous order jailing the Plaintiffs and ordered Ms. Mitchell and Mr. Brown released and subject to a new debt "payment plan."

[8] Notwithstanding the unconstitutionality of the City's conduct regardless of state law, the City has not offered in any of the Plaintiffs' cases any valid state-law basis for continuing to put people on "probation" years after tickets are resolved, let alone for jailing them for nonpayment of old monetary debt from various costs, fees, and extra surcharges associated with that "probation."

10

39. Tequila Ballard is a 33-year-old single mother of four children living in Montgomery, Alabama. Her children, who live with her and depend on her for care and support, are 8, 9, 11, and 13 years old. *See* Exhibit 12.

40. On March 22, 2014, the police arrested Ms. Ballard for unpaid traffic tickets dating as far back as 2008. After two days in jail, she was brought to the Montgomery Municipal Court on March 24, 2014.

41. When Ms. Ballard was brought before the court, the City judge told her that the costs and surcharges accumulated with the tickets meant that she now owed the City $4,985. The court asked why she had not paid the debts, and she told the court that she could not afford them. The City ordered her to pay the debts immediately or to spend 99 days in the City jail in order to serve out her debt to the City at $50 per day.

42. Neither the court nor the City prosecutor made any meaningful inquiry into her ability to pay or financial circumstances. No findings were made concerning her ability to pay. The court did not provide a lawyer to represent her at the hearing.

43. When Ms. Ballard got back to the jail, she was given a paper from the court that said that she could either pay $4,700 and be released immediately (with the balance due 90 days from release) or spend 99 days in jail. *See* Exhibit 13.

44. Ms. Ballard was devastated. She takes care of her four children, and when she was locked in the City jail, she was constantly worried about how they would survive without her.

45. At the jail, Ms. Ballard was told that she could be released earlier if she reduced her debt by working as a janitor at a rate of $25 per day. She was told to clean the City court bathrooms as well as the bathrooms and other filthy places at the jail.

46.     Ms. Ballard has had difficulty finding employment to support her family on an income well below the federal poverty line.  She and her four children depend on food stamps to survive, and she also had a minimum wage job at a fast food restaurant that she lost because of being put in City jail for her tickets.  One of her children is disabled, and Ms. Ballard depends on SSI disability payments to help him.  Her kids need food, clothing, educational materials, medicine, and a safe and sanitary place to live.

47.     Ms. Ballard spent 45 days in an overcrowded and unsanitary City jail cell until the City released her after the intervention of present counsel.  The City has now ordered Ms. Ballard to make monthly payments of $50 per month on her debts or face jailing again.

### ii.     Plaintiff Thomas Ellis

48.     Thomas Ellis is a 52-year-old resident of Montgomery.  He is disabled and depends on SSI disability payments to survive and to meet the basic necessities of life, such as food, clothing, and medical care.  *See* Exhibit 14.

49.     Mr. Ellis suffered a stroke within the past several years and cannot function normally.  He has difficulty speaking and moving normally.

50.     Mr. Ellis was arrested by the City police on April 17, 2014, and brought to City court on April 18, 2014, because of unpaid traffic tickets.

51.     When Mr. Ellis went before the court, the City judge asked him why he had not paid his tickets.  He told the court that he did not have enough money and was unable to pay them.  The judge told him that he had to either pay $2,801 or serve out his debts to the City at $50 per day for 56 days in the City jail.  *See* Exhibit 15.

52.     Neither the court nor the City prosecutor made any meaningful inquiry into his circumstances or his ability to pay, and he was quickly returned to the jail.  He was not given an attorney to represent him at the hearing.

53.     Mr. Ellis spent 19 days "sitting out" his debts at the overcrowded City jail before the intervention of present counsel.  Because Mr. Ellis was released prior to serving out the entirety of his debts, the City has now ordered him to pay $50 per month, by necessity from his SSI disability check, or face jailing again.

### iii.     Plaintiff Willie Williams

54.     Willie Williams is a 53-year-old resident of Montgomery.  He is the father of two children, aged 28 and 25, and he has five grandchildren, aged 10, 8, 8, 6, and 5.  *See* Exhibit 16.

55.     Mr. Williams is the legal guardian of his 10-year-old grandson, who lives with him.  Mr. Williams also lives with his brother and mother, who depends on Social Security for income and also helps as an aide for handicapped children on school buses.

56.     Mr. Williams and his grandson depend on food stamps and Medicaid for basic necessities like food and medical care.  They are struggling financially, and the last time Mr. Williams worked was in February 2014.  He is currently unemployed.  In the past, he has worked in construction, but he is getting older and less fit for such difficult physical labor.

57.     On March 31, 2014, Mr. Williams was arrested by the City police.  He was brought to the Montgomery Municipal Court on April 1 because of unpaid traffic tickets.

58.     When Mr. Williams was brought before the court, the City judge asked Mr. Williams if he could pay his tickets and accumulated fees and surcharges that day.  He told the judge that he did not have the money to pay the City.  The City judge told him that the court

would order him to serve about 20 days in jail to sit out some of his debts at a rate of $50 per day and that Mr. Williams would have to pay the rest by July.

59.     Neither the judge nor the City prosecutor made any other inquiry into his financial circumstances or ability to pay.  The whole hearing lasted about 2 minutes.  The City did not provide him with an attorney to represent him at the hearing.

60.     When Mr. Williams got back to the jail, he was given a sheet of paper that said that he could either pay the City $1,091 or serve 21 days in jail.  *See* Exhibit 17.  The jail staff told him that he could work off his debts to the City more quickly at a rate of $25 per day if he agreed to work for them while jailed.  Because Mr. Williams wanted to get back to his family and to his grandson, he tried to work for his jailors every day.

61.     Mr. Williams observed and endured a seriously overcrowded City jail.  During his time there, men were forced to sleep all over the cells, including under tables and on the floor.  It appeared that people were catching illnesses from each other.  One man had a seizure and no jail employees were giving him any medical attention, so the rest of the inmates almost had to start a riot by banging until they could get any jail staff to give him help.

62.     After Mr. Williams had spent about 10 days in jail away from his grandson, his mother was able to raise some money, and she went to the City clerk's office and bought her son's freedom from the City jail for a few hundred dollars.  The City let Mr. Williams out, and he is required to pay the rest by July or face jail again.

     **iv.    Plaintiff Gavin Bullock**

63.     Gavin Bullock is a 25 year-old married father of three young children.  *See* Exhibit 18.

14

64.     Mr. Bullock is disabled and suffers from Crohn's disease.  He relies on SSI disability payments to meet the basic necessities of life for his family.  One of his children is deaf, and Mr. Bullock requires significant additional time and resources to take care of him.

65.     Mr. Bullock was arrested on April 6, 2014, and brought before the City court on April 7, 2014, for unpaid tickets.  When he was brought before the City judge, the court told him that he owed over $2,000 on accumulated debts from his tickets.  He told the judge that he did not have the money to pay the City.

66.     The City judge did not make any meaningful inquiry into his ability to pay.  The City did not provide an attorney to represent him during the hearing.  The City judge ordered him to either pay the City $2,438 or spend 48 days in the City jail.  *See* Exhibit 19.  Mr. Bullock was sent immediately back to the City jail.  The whole hearing lasted about 30 seconds.

67.     Because of his disease, Mr. Bullock requires intravenous medical treatments on a regular basis.  While he was locked in the City jail, he was overdue for his treatments, and he was not given treatment despite repeated requests.  As a result, he began experiencing bloody stools, loss of weight, and "flare ups" of excruciating stomach pain.

68.     After approximately 22 days in jail, Mr. Bullock's family was able to raise enough money to pay to get him released from the City jail.  By that time, his debts had been reduced down to near $1,000.  The City released him when his family showed up with the money.

**v.     Plaintiff Kendrick Maull**

69.     Kendrick Maull is a 22-year-old resident of Montgomery.

70.     Mr. Maull was arrested by the City police on May 4, 2014, and brought to the City court on May 5, 2014, for unpaid traffic tickets.

71.     When Mr. Maull was brought before the City court, the judge asked him why he had not paid his old tickets.  Mr. Maull told him that he had not been working at the time, was going through some family issues, and did not have enough money.  As Mr. Maull was trying to explain his situation to the judge, the judge cut him off and would not let him speak.  The City judge told him that he would not be released unless he could pay about $900.

72.     The City judge then turned to Mr. Maull's mother, who was standing next to him, and asked if she could get $900 down to the court to pay his debts.  When his mother indicated that she did not have that much money, the judge sent Mr. Maull back to the jail.  He was ordered to serve out his debt at $50 per day.  The whole hearing lasted about 60 seconds.

73.     Mr. Maull was not given a lawyer at the hearing, and neither the judge nor the City prosecutor made any further attempt to inquire into his financial or personal circumstances.

74.     After the court hearing, the City prepared a document stating that Mr. Maull would have to sit out in jail $613 of his debts at $50 per day, with the remainder due to the City by August 6, 2014.  *See* Exhibit 20.

75.     After a couple of days in jail, Mr. Maull's family was so worried about him surviving in jail that several of his relatives scraped together the money to pay the City to get him out.  Mr. Maull and his family were all also worried that he would lose his job that he had worked so hard to keep.

76.     Mr. Maull had been unemployed until he got a job at Walmart a little over a year ago.  He had been earning $7.65 per hour until he recently got a promotion to a little over $8 per hour.  Several hours before his arrest, he had to leave work and go to the emergency room because of chest pains, dizziness, and blacking out.

77.     With his wages, he has to pay for food, household bills, medical care, rides and bus fare, clothes, and all of the other necessities of life.  He estimates that he probably made between $8,000 and $9,000 in the past year.  He had a bank account that he opened a few days before being jailed that probably has about $100 in it, and he does not own anything else of significant value.

### vi.     Plaintiff Tamara Dudley

78.     Tamara Dudley is a 23-year-old resident of Montgomery, Alabama.  She is the mother of two children, ages 1 and 2.  *See* Exhibit 21.

79.     Ms. Dudley was arrested on May 4, 2014, and brought before the Montgomery Municipal Court on May 5, 2014, for unpaid traffic tickets.

80.     The City judge told Ms. Dudley that she owed about $1,400, and asked her why she had not paid the City. Ms. Dudley told the judge that she could not afford it.  As she was beginning to explain why, the City judge cut her off and would not let her speak.   The judge asked Ms. Dudley's sister, who was standing next to her, if she could bring money to pay Ms. Dudley's debts.  Neither Ms. Dudley's sister nor Ms. Dudley had the money to pay the City, so the judge sent Ms. Dudley back to the City jail to serve out her debts at $50 per day.  The court did not conduct any meaningful inquiry into her ability to pay or her personal circumstances. She was not given an attorney to represent her at the hearing.

81.     As Ms. Dudley was being taken out of the courtroom back to the jail, she heard the City judge tell her sister that Ms. Dudley would be set free if her sister could get about $800 down to the court.

82.     At the jail, Ms. Dudley was eventually given a piece of paper stating that she would have to serve 17 days in jail or pay the City $898.  *See* Exhibit 22.

83.    For many hours, Ms. Dudley was not able to speak to her family to find out where her children were.

84.    At the time she was jailed, Ms. Dudley had been unemployed for months since losing her job, and she and her children relied on food stamps and WIC to survive.

85.    Ms. Dudley was released from the City jail after the intervention of present counsel and still allegedly owes debts to the City.

**vii.    Plaintiff Jermaine Tyler**

86.    Jermaine Tyler is a 27-year-old resident of Montgomery and the father of a 7 year-old daughter.  *See* Exhibit 23.

87.    Mr. Tyler was arrested by the City police and taken to the City court on March 31, 2014.

88.    When Mr. Tyler went in front of the City judge, he was told that he owed about $2,000 on old traffic tickets.  The City judge said that Mr. Tyler could either pay that amount or sit in City jail for 40 days.  Mr. Tyler told the court that he was working part time but that he could not afford to pay the City.  The judge did not make any inquiry into Mr. Tyler's financial or family circumstances and sent him to the jail.  Mr. Tyler was not given a lawyer to represent him at the hearing.  The whole hearing lasted between 30 and 45 seconds.

89.    When Mr. Tyler got back to the jail, he was given a sheet of paper that said he could pay $1,275 or serve 25 days in City jail.  *See* Exhibit 24.

90.    The jail was extremely uncomfortable for Mr. Tyler.  Because it was so crowded with other men with unpaid tickets, he was forced to sleep on the cell floor, and he is still having back problems because of it.

91.     Mr. Tyler had to stay in the City jail for about 5 days until relatives and friends raised enough money to pay what the City wanted to let him out of jail.

92.     Mr. Tyler works part-time as much as he can doing construction work and has difficulty meeting the basic necessities of life for himself and his family.

### viii.    Plaintiff Janet Edwards

93.     Janet Edwards is a 58-year-old resident of Montgomery.  She is the mother of two children, ages 18 and 26.  Her younger child still lives with her and is finishing high school.  *See* Exhibit 25.

94.     Ms. Edwards is disabled, and she depends on her social security disability income for survival.

95.     Ms. Edwards was arrested on June 13, 2013, and brought to the Montgomery Municipal Court for unpaid traffic tickets on June 14, 2013.  Ms. Edwards had been trying to make payments on her traffic tickets and had called the City clerk's office to ask for an extension.  The clerk told her that she was entitled to one extension.  When she got to the clerk's office in the morning, the clerk took her identification, went to the back of the office, and then came back and asked her if she had $200.  Ms. Edwards replied that she did not have money and was trying to ask for an extension.  A bailiff then came and arrested her.  The bailiff allowed her son to come and retrieve some of her belongings.

96.     Ms. Edwards spent the rest of that morning and afternoon in a holding cell without food.  The next morning, she was taken to the City court.  The City judge first asked her if she worked, and she responded that she did not.  Ms. Edwards told the judge that she needed an extension on her payments.  The judge told her not to "worry" about it and said that, by the time she got out of jail, her tickets would be paid off.  The judge then ordered her to serve 13

days in the City jail.  Neither the City judge nor the City prosecutor made any meaningful inquiry into her ability to pay.  The City did not provide her a lawyer to represent her at the hearing.

97.    After her court hearing, the City prepared a document stating that she would have to serve out $675 in debts at the City's rate of $50 per day.  *See* Exhibit 26.

98.    Once back at the jail, she was told that she could work off her debts at $25 per day if she agreed to jail work assignments.  She cleaned the Municipal Court building, including the bathrooms, floors, and windows of the City courthouse.  She also emptied trash in the offices of the City court employees.

99.    Ms. Edwards had a herniated disk at the time, but she had to sleep on the floor because the City jail was so crowded.  The City jail was so crowded that a woman stepped on her in the middle of the night on her way to the bathroom, making her arm swollen.

100.    When Ms. Edwards had "worked off" her debt down to about $180, her son and a neighbor combined to pay off the rest of her debt.  Her neighbor, who works at the Federal Defenders Office in Montgomery, went down to the City court on her lunch break and paid to get Ms. Edwards out.

### ix.    Plaintiff Risko McDaniel

101.    Risko McDaniel is a 38-year-old resident of Montgomery. He is the father of two children, and he currently lives with and helps to raise four step-children.  *See* Exhibit 27.

102.    Mr. McDaniel was arrested and brought to the Montgomery Municipal Court on May 5, 2014.  He was told that he owed money on unpaid cases from 2001 and 2003.  The judge asked him why he had not paid his debts.  He told the judge that he had been incarcerated for 7 years.  The judge asked him how much he could pay immediately.  Mr. McDaniel told the judge

that he had just paid his rent but that he could maybe have someone get $200 to the court that day. The judge then said that Mr. McDaniel would have to serve 15 days in the City jail and sent him back to the jail. The judge made no meaningful inquiry into his circumstances or ability to pay.

103. The whole hearing lasted between 30 seconds and 2 minutes. Mr. McDaniel was not given a lawyer to represent him at the hearing.

104. Mr. McDaniel was returned to the holding cell, where he sat from his arrest at 1:40 a.m. until 5 p.m. the next day (with the exception of his brief court hearing). He estimates that there were at least 30 other men in the cell for all of those hours, and all of the men had one toilet and no sink. Mr. McDaniel was forced to sleep on the floor.

105. When Mr. McDaniel was returned to the City jail after court, he was given a piece of paper from the City court that told him that he could either pay the City $754 or serve 15 days in City jail. *See* Exhibit 28.

106. Mr. McDaniel works at and helps to run a barber shop and typically works 7 days per week. It is difficult for him and his family to meet the basic necessities of life given that he owes significant debts for child support that accumulated while he was in prison for a drug-trafficking offense, as well as a significant amount of restitution for his drug trafficking offense in state court. He also supports his other children and has to pay rent, utilities, food, and all of the other necessities for his family.

### x. Plaintiff Demetri Colvin

107. Demetri Colvin is a 21-year-old resident of Montgomery. He is the father of a 2-year-old child, for whom he cares every day. *See* Exhibit 29.

108.    Mr. Colvin was arrested and brought to the Montgomery Municipal Court on May 5, 2014.  The court asked why he had not been making debt payments on his old cases.  He told the court that he had just started working part-time, that he had been in school, and that he could not afford to make payments.  The court told him that he could not get out of jail unless he paid the City $340.  Mr. Colvin did not know what cases the judge was talking about, and no one told him what cases the hearing concerned.  No meaningful inquiry was made into Mr. Colvin's ability to pay.  The whole hearing lasted about 30 seconds before he was returned to the jail.

109.    When Mr. Colvin got back to the jail, he was given a sheet of paper that stated that he owed the City $1,557 or 31 days in jail.  It also said that he could be freed if he paid $340 toward his debts.  *See* Exhibit 30.

110.    Mr. Colvin was supposed to graduate with an associate's degree from Alabama State the Saturday following his jailing.  He would not have been able to attend but for the intervention of present counsel, who secured Mr. Colvin's release.  Mr. Colvin still allegedly owes the City debts and is in danger of being imprisoned again.

111.    Prior to his arrest, Mr. Colvin had been working part time in construction and, days before his arrest, had gotten a minimum-wage job at a restaurant.

### xi.    Plaintiff Carl Williams

112.    Carl Williams is a 57-year-old resident of Montgomery.  He relies on social security disability income as his only means of survival.  *See* Exhibit 31.

113.    Mr. Williams has been arrested and locked up by the City for unpaid tickets several times.  Most recently, he was arrested on September 28, 2013, and brought to the Montgomery City Court for unpaid traffic tickets on September 30, 2013.  When he was taken in front of City judge, the judge told him to pay about $700 immediately.  Mr. Williams told the

judge that he could not pay that much but that he could get together about $150. The judge ordered him to the City jail to serve out his debts at $50 per day.

114.    The hearing lasted about one minute. Neither the judge nor the City prosecutor made any meaningful inquiry into Mr. Williams's financial circumstances.

115.    After Mr. Williams was returned to the jail, the City prepared a court document stating that he would have to sit out in jail $590 of his debts at the City's rate of $50 per day—which the City calls "commuting" his case. *See* Exhibit 32.

116.    The jail was so crowded that Mr. Williams had to sleep on the floor. Mr. Williams believes that he caught bronchitis from another sick inmate who was very close to him.

117.    After about 4 days in jail, Mr. Williams and his family got together approximately $390, which his family paid to the City to buy his release from jail.

### xii.    Plaintiff Rayshone Williams

118.    Rayshone Williams is a 29-year-old resident of Montgomery. He is the father of four children, including three boys and a girl. Mr. Williams tries to support all of them, and he takes care of two of them every day. *See* Exhibit 33.

119.    Mr. Williams has been arrested by the City of Montgomery several times in the past two years because he could not afford to pay debts from old traffic tickets. The most recent time was in March 2014, when he was put in jail for unpaid debts from a speeding ticket and an expired tag ticket.

120.    When Mr. Williams was brought before the City court, the judge would not let him explain his situation. The judge simply told him how much he owed, and Mr. Williams tried to tell the judge that he has four children and receives SSI disability. The judge ordered Mr.

Williams to be sent to the City jail.   The City did not give him an attorney to represent him at the hearing.  The whole hearing lasted about one minute.

121.    The same thing happened to Mr. Williams on other occasions, including on December 5, 2012.  When he was brought before the City court that time on tickets from 2009, the court ordered him to pay $951 to the City immediately or serve 19 days in the City jail.  *See* Exhibit 34.  Like in March 2014, the court also did not make any inquiry into his circumstances or ability to pay before jailing him.  After spending 14 days in the City jail, he was released early because he had "worked off" debts while in the City jail.

122.    Mr. Williams has been diagnosed with paranoid schizophrenia. He has relied on social security disability to meet the basic necessities of life since he was a teenager.

D.      **The City's Policies and Practices**

123.    The treatment of the Plaintiffs was caused by and is representative of the City's policies and practices employed to collect debts from the fines, fees, costs, and surcharges that the City assesses, usually for traffic tickets.  These facts are similar to those alleged in the Amended Complaints in cases 2013-cv-732-MEF (Doc. 10) and 2013-cv-733-MEF (Doc. 9), which describe additional people whose rights were violated by the same policies and practices.

124.    The Plaintiffs and other witnesses have, in recent months and years, observed numerous other Montgomery residents jailed by the City for non-payment of debts without a meaningful inquiry into their ability to pay, without the representation of counsel, without the consideration of whether imprisonment serves legitimate interests in light of available alternatives as required by federal and Alabama law, and without examination or findings on any

of these issues.[9]  Moreover, these cursory and fleeting proceedings (commonly lasting less than a minute to two minutes) typically do not even identify the specific debts and surcharges owed or the cases in which they were supposedly incurred and do not provide a debtor with a meaningful opportunity to contest the validity of the debt.

125.    The Plaintiffs and other witnesses have observed numerous other people and families who were told that they or their family member would be held in jail by the City unless and until they or their family members brought forward large sums of money to pay off debts supposedly owed for traffic tickets and subsequent surcharges.

126.    On the date that each initial Plaintiff (Ms. Mitchell, Mr. Brown, Mr. Williams, and Mr. Tubbs) was order jailed, there were 67 people brought into court from the City jail for the City's jail docket, almost all of which involved money owed for traffic tickets or minor offenses.  The City holds Municipal Court every business day.

127.    The City's policy is to assess fines, costs, surcharges, and additional fees upon a finding of a traffic violation or the resolution of any other case.  If the person can afford to pay the total cost, the person is permitted to pay, and the case is closed.  If the person cannot afford to pay the entire amount, the City either gives the person a date by which to pay in full or puts the person on a "payment plan."

128.    The City has contracted with Judicial Correction Services (JCS, Inc.) to collect those payments, referring to this system of debt collection for traffic tickets as "probation."  JCS, Inc. operates what it calls an "Offender Funded Model" of probation, promising the City that it will not charge the City for its services.  Instead, JCS, Inc. charges debtors—those who cannot afford to pay their tickets immediately—additional monthly fees for the ability to be on

---

[9] In addition to violating the United States Constitution, these practices also violate the Alabama Constitution and the explicit requirements of Alabama court rules.  *See, e.g.*, Ala. Const. art. I, §§ 1, 6, 22; Ala. R. Crim. P. 26.11; Ala. Code § 15-12-1; Ala. Code. § 15-12-5(c); Ala. Code § 12-14-13(a).

25

"probation," typically $40 per month on top of whatever is owed to the City. JCS, Inc. also charges an initial "set up" fee when a person is placed on "probation." The City places people on such "probation" payment plans pursuant to general practice and standing orders. As a matter of practice and procedure, neither JCS, Inc. nor the City makes any inquiry into ability to pay or waives such fees if the person is indigent.

129.   If a person is unable to make a full payment, JCS, Inc. often takes out the amount owed to JCS, Inc. first so that JCS, Inc. is paid even if a person's debt to the City is not reduced.

130.   Many people have made payments to the City and to JCS, Inc. only to learn later that there was no record of those payments and to be ordered to make them again.

131.   If a person misses payments or pays less than required, JCS, Inc. has the purported contractual authority and discretion to decide whether to petition the City for "revocation" of probation. JCS, Inc. also has a policy of placing people who cannot make full payments—from whom the company has difficulty making a profit—in "warrant status," which can result in warrants issued for their arrest by the City and which constitutes a JCS, Inc. determination that JCS, Inc. will not accept the person for future probation supervision. JCS, Inc. communicates this decision to the City, and the City policy and practice is to agree not to place such people back on probation, requiring instead that those people pay in full or go to jail.

132.   In other cases in which a person is making substantial payments, JCS, Inc. has a personal financial interest in extending a person's probation and in keeping the person on a payment plan for as long as possible so that it can profit from the collection of more monthly fees.

133.   Thus, under the City's scheme, JCS, Inc. can not only decide whether to initiate judicial revocation proceedings, but also whether a person is put on probation and what judicially

ordered conditions are imposed.[10]  JCS, Inc., will also make other recommendations to the City judge concerning how JCS, Inc. believes the person has fared on probation, whether the person should be placed on probation, whether JCS, Inc. considers the person "eligible" for probation, what the amount of monthly court-ordered payments should be, and a variety of other case-related decisions.  For example, in the cases of Ms. Mitchell and Mr. Brown, the City did not put them on payment plan probation with JCS, Inc. because JCS, Inc. declined to accept them.

134.    JCS, Inc. has a personal financial interest to conduct its role as a probation officer in a way that maximizes its personal profit and not necessarily as a neutral public court officer.

135.    JCS, Inc. uses a "probation" room inside the City building that also houses the Municipal Court, directly across from the Municipal courtroom.  A JCS, Inc. employee often sits in the Courtroom near the judge and advises the judge about how to handle the cases of "probationers" and potential "probationers."

136.    JCS, Inc. and the City enforce a policy and practice of initiating and issuing warrants when a person misses a payment or fails to make sufficient payments without considering the person's ability to pay—even when they have knowledge that the person is indigent—and without providing notice and validly summoning the person to court for a hearing. Instead, City policy allows the City to issue and execute warrants, and City officers go to the homes of traffic debtors to arrest them.  The City policy and practice is also therefore to deprive people of their liberty without any prior notice and opportunity to be heard and without any basic inquiry into whether the debt is owed, actually unpaid, or still valid.

137.    The City often chooses to execute these warrants prior to or over the weekend, which results in a person serving needless extra time in jail prior to the next available court date.

---

[10] People placed on "probation" because they cannot afford to pay their fines, fees, costs, and surcharges immediately are also forced to abide by additional restrictions on their liberty, which the City calls "conditions" of probation, which are imposed solely because of their wealth status.

138.    When warrants are issued and executed, the City adds fees, costs, and surcharges to the amounts of debt already owed.  In addition to court fees and JCS, Inc. fees and costs, the City routinely adds surcharges for warrants, a "solicitor" fee, and even a 30% debt-collection fee. Navigating the origin of these numerous fees and surcharges and determining whether they are even validly assessed by the City in any particular case is a complicated inquiry involving the application of state law, local law and practice, and constitutional law to a person's case history.

139.    When a person is brought into court after an arrest, the City's policy is to order them to pay their debt—or a significant portion of their debt—immediately or be held in jail until their debt is extinguished at a rate of $50 per day.  If JCS, Inc. informs the City that it does not want to accept a person onto "probation," the person will be ordered to make payments directly to the City or be jailed.

140.    The City calls these orders "fines or days" and refers to this policy, without any irony, as "commuting" people's "sentences."

141.    The City's policy and practice is to conduct no inquiry into the person's ability to pay, and the City's policy and practice is to refuse to use even the state-issued Affidavit of Substantial Hardship that courts are required to use to determine indigence.  The City's policy and practice is therefore to provide no notice or opportunity for the debtor to present evidence concerning their ability to pay or concerning any other relevant question.  The City's policy and practice is to make no further findings concerning ability to pay, alternatives to incarceration, waiver of counsel, whether the debt is valid or owed, or any other legally or constitutionally relevant question.

142.    If family members are present, the City's practice is to call them up to the bench and to ask them to pay as much of their family member's debts as they can on the threat that the

28

person who allegedly owes the money will be jailed if the family members do not pay.[11]  The City does not conduct any meaningful inquiry into the person's ability to pay and does not even explain to people how they might claim indigency through standard forms issued by the State of Alabama.

143.    The amount of debt announced to debtors by the judge in open court often differs from the amount listed on the paperwork that they receive on their return to the jail.  The paperwork amount is usually less than the open court amount, meaning that debtors will often have a balance remaining after they "serve out" their fines, leading to their placement back on a payment plan and their continued supervision.  The City appears to refer to this as "reopening" their cases, although this "reopening" and the corresponding modifications that it entails are not performed at any formal hearing or even in the person's presence.

144.    Once people return to the jail from City court, they are told of the City's policy of "working off" an extra $25 per day of their debts if the person agrees to labor in the City jail while he or she is imprisoned.

145.    Inmates desperate to return to their families by "working off" their debts more quickly compete on a daily basis to be selected by City jail employees for a limited number of difficult, unsanitary, and demeaning daily labor tasks.  These tasks include cleaning the offices of City employees in the Municipal Court building, the bathrooms in the City police department and Municipal Court, and cells and bathrooms in the City's overcrowded jail.

---

[11] For example, on January 27, 2014, the same day that the initial Plaintiffs appeared in the City court, another local man was brought from the City jail before the court for unpaid traffic tickets.  The judge informed the man and his family, who appeared with him in court, that they would have to pay about $915 in order to get him out of jail or else he would "sit out" his debt to the City.  When the family informed the judge that they were too poor to pay, the judge ordered him held in custody, and the man was taken back to the City jail.  The man's mother was concerned for her family because the man had recently been hired at a new manufacturing job and was still in his probationary period with his new employer.  He would have been fired from his job if he served out his debt.  The next day, the man's indigent, disabled mother was able to pull together some money, and she brought $452 to the clerk's office.  The clerk's office accepted the money, and the man was released that afternoon.

146.    The City's debt collection practices are enormously profitable, especially in getting family members with no legal obligation to pay any money to the City to come up with money to get their loved ones released from jail and in getting low-income people to forgo basic necessities of life in order to pay JCS, Inc. and the City in an attempt to avoid jail.

147.    For example, the 2013 City of Birmingham budget reflects approximately $2.8 million from court fines and traffic citations, the City of Mobile approximately $2 million, and the City of Huntsville approximately $2.5 million. In contrast, the City of Montgomery budget reflects revenue of $15.9 million from municipal court "fines and forfeitures."[12]

148.    The City uses the money collected through these procedures to fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

149.    The City's recent "Amnesty Day" program starkly demonstrates its practice of jailing persons who are unable to pay debts to the City. In May 2013, Montgomery Mayor Todd Strange and City Municipal Court Administrator Kenneth Nixon (who is also a member of the Mayor's cabinet), announced that the City would offer an "Amnesty" program on the first two Saturdays in June. Under this program, the City announced that it would remove certain fees, eliminate arrest warrants, and institute a payment plan if individuals were unable to pay the full amount to which the City claimed it was entitled.

150.    However, at least 15 people were arrested on the first day of the "Amnesty" program because they had too much debt allegedly outstanding (greater than $2,500) or because they did not bring at least $150 (or 10% of what was owed, if greater) to pay the City. They

---

[12] The City's publicly available budget does not itemize "fines and forfeitures" in as much detail as do the budgets of some other cities, which makes it difficult for the public to know the exact source of these funds. But, the "fines and forfeitures" collected by the City of Montgomery appear substantially higher than those collected by any other major Alabama City, even those cities larger than Montgomery.

were arrested pursuant to a City policy that required the arrest and jailing of people whose debts met these criteria regardless of a person's ability to pay or financial circumstances.

151.    These policies and practices have created a culture of fear among the City's poorest residents, who are afraid even to appear in City court to explain their indigence because they know they will be jailed by the City without any meaningful process.  Indeed, Mr. Nixon reported to the Montgomery Advertiser that many residents were jailed during the amnesty program because they owed too much and could not pay even 10% of what they owed.  Mr. Nixon publicly acknowledged that the arrests probably scared others from participating in the "Amnesty" program.

152.    The same fear motivates many very poor City residents to sacrifice expenditures on food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debt to the City.

153.    Mr. Nixon warned that, following the 2013 Amnesty Program, the City would be "stricter" about arresting people for unpaid debt.  The City also has a policy of referring unpaid debt to the Montgomery County District Attorney's Office, which will send letters to debtors on the City's behalf threatening imminent arrest if they do not pay their debts.  A surcharge of 30% of the value of the debt is added to the debt to compensate the District Attorney's Office for its participation in the City's debt collection.  The City purports to have the authority to arrest and jail indigent people when they cannot pay even these additional surcharges.

154.    The City has stated that it seeks to use these collection programs and tactics to go after old traffic debt, including debt dating back to the 1980s.

155.    As in the Plaintiffs' cases, the City's policy is to modify orders of incarceration outside of any formal judicial process.  These modifications include: decreasing a person's jail

time from what was announced in open court so that a person is released with a remaining balance owed; allowing a person's release without any hearing if the person or family members present some money to the City clerk; and allowing City employees to reduce the time a person is ordered to be in jail based on labor performed in the jail without any judicial involvement.

156.    Plaintiffs and witnesses have observed numerous other similar violations of basic constitutional rights in the Montgomery Municipal Court within the past year.

157.    Just to take one day, for example, on January 27, 2014, a homeless military veteran appeared with a social worker from the Veterans Administration.  The man told the judge that he could not afford the debts but that he hoped to be receiving some disability payments from the Veterans Administration and hoped to get a job when he completed a mental health program in which he was currently enrolled.  The judge told him that the City would not wait for the Veterans administration to pay the man and that, if the man could not pay by June, he would lose whatever job he had because he would be "upstairs sitting your fine out" at the City jail.

158.    On that same day, the City ordered multiple other people to jail terms for failure to pay traffic ticket debt despite their protestations of indigence.  The City did not hold any inquiry into their ability to pay as required by clearly established Alabama and federal constitutional law.  A small sample of the many cases publicly observed that day included:

- A diabetic man who stated that he was too poor to afford his debt.  The judge told him: "I gotta get some money before you can go."  Then the judge said: "you get $1,000 down here, you can come home."   As the man attempted to protest to the judge, courtroom security took him back into custody.
- An inmate was brought out from the jail, and the judge told his family that he would not be released unless the family could get several hundred dollars down to the municipal court clerk's office.
- A woman claimed to be too poor to afford her debt to the City.  The judge told her: "you've got to get this paid or you'll end up in jail."  He then ordered her to pay in full within 4 weeks and told her that she would not be granted any extensions.  The judge did not conduct any hearing into her indigence.

32

Each of these hearings was exceedingly brief and included no meaningful inquiry by the City prosecutor or City judge.  These observations reflect the same City conduct that has been documented on numerous occasions by a multitude of courtroom observers in recent months and years.

## **Class Action Allegations**

159.    Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

160.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the City's unlawful debt-collection scheme.

161.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

162.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

163.    Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.  The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the City of Montgomery from fines, fees, costs, or surcharges arising from cases in the City court.

164.    The Damages Class is defined as: All persons who, from March 18, 2012, until the present, were jailed by the City for non-payment of debts from fines, fees, costs, and surcharges arising from cases in the City court.

165.    The Damages Class contains two Subclasses: the Jail Labor Subclass and the "Probation" Subclass.  The Jail Labor Subclass is defined as: Those people who were jailed by

the City for non-payment of debts and who were subjected to the City's policy of releasing people from the City jail more quickly if they "worked off" their debts, including by laboring for the City to clean the offices of City court employees, municipal court bathrooms, the City jail, and other City property.  The "Probation" Subclass is defined as: Those who were placed on "probation" by the City and forced to comply with restrictions on their liberty in the form of probation conditions based solely on their wealth status, including those whose proceedings involved a private "probation officer" who had a direct financial stake in decisions about whether to place the person on "probation," whether to petition to revoke "probation," and what evidence to present at such proceedings.

A.    **Numerosity.  Fed. R. Civ. P. 23(a)(1)**

166.    Over the past several months and years, the City has required and currently requires over a thousand and sometimes two thousand people at any given time to serve terms of what the City calls "probation" through JCS, Inc. based on nothing more than their ability or non-ability to pay their debts to the City from fines, fees, costs, and surcharges.  In addition, City records show hundreds of additional people similarly ordered to make payments under threat of incarceration directly to the City court clerk.  Pursuant to City policy and practice, all of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency purportedly required by the City.

167.    The City has jailed hundreds of Montgomery residents for non-payment of debts in each of the past several years according to the City's publicly available jail docket records. The names, case numbers, and dates of initial imprisonment of those jailed appear on the City court's daily "jail" and "compliance" dockets.

168.    The City followed and follows the same debt-collection policies, practices, and

34

procedures to accomplish the jailing of the Class members.  For example, pursuant to the City's policy and practice, those jailed by the City for non-payment did not receive meaningful inquiries into their ability to pay as required by federal and Alabama law.  Pursuant to City policy, no determinations of indigence or evaluations of alternatives to incarceration were made, and the City provided none of the relevant state and federal protections for debtors.   Nor were those jailed by the City provided adequate counsel to represent them at the fleeting court proceeding that resulted in their jailing.  All of those jailed are informed of the City's policy of requiring them to sit out their debts at $50 per day.  All of those jailed are informed of the City's policy of assigning inmates to "work off" their debts for an extra $25 per day, and many inmate debtors perform these work assignments on a daily basis.

169.    Those who still owe the City debt payments or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**B.    Commonality.  Fed. R. Civ. P. 23(a)(2).**

170.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  The Plaintiffs seek relief concerning whether the City's policies, practices, and procedures violated their rights and relief mandating the City to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

171.    Among the most important, but not the only, common questions of fact are:

- Whether the City has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before ordering the person's jailing for non-payment;
- Whether the City has a policy and practice of having debtors serve out their debts in the City jail at a rate of $50 per day;
- Whether the City has a policy and practice of assigning janitorial work to debtors through which they "work off" their debt at an extra $25 per day;
- Whether the City provides notice to debtors that their ability to pay will be a

relevant issue at the hearings at which they are jailed and whether the City makes findings concerning ability to pay and alternatives to incarceration;

- Whether (and, if so, how) the City provides representation to those jailed for unpaid debts in proceedings that result in their incarceration;
- What procedural mechanisms, if any, the City uses as matter of policy and practice to determine indigence; for example, whether the City uses a standard state-issued form for determining ability to pay;
- Whether the City applies state procedural and state and federal substantive law designed to determine indigence and to protect indigent debtors;
- Whether the City relies on the decisions and representations of a private actor with a financial stake in the proceedings to make determinations about placing people on "probation" or to make decisions about revoking "probation";
- Whether the City places people onto "probation" that involves additional restraints on their liberty solely because those people cannot pay their fines, costs, fees, and surcharges;
- Whether the City has standing orders placing people onto for-profit "probation" regardless of the individual circumstances of their case and without conducting any indigency determination;
- Whether City employees and agents have a policy and practice of threatening debtors with incarceration for unpaid debts without informing them of their constitutional rights;
- Whether the City notifies people of the right to appeal, charges fees to indigent people for the right to pursue and appeal, and informs them of any right to have that fee waived;
- Whether the City has a policy of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt.

172.    Among the most important common question of law are:

- Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by the City for non-payment of debts;
- Whether people who cannot afford to pay the City are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;
- Whether people are entitled to the appointment of and representation by a lawyer in proceedings initiated and litigated by City prosecutors that result in their incarceration if they cannot afford an attorney;
- Whether speaking to an inmate out of court in advance of a court hearing but not representing that inmate at the court hearing constitutes adequate representation;
- Whether the City can employ jail, threats of jail, and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay the City in full;
- Whether the City can jail traffic debtors for non-payment of debt and require them to "sit out" their debts at $50 per day unless the person agrees to perform labor for

36

the City, in which case the City assigns them to "work off" their debts at $25 per day extra;

- Whether the City can rely on a private actor with a significant financial stake in the proceedings to make enforcement decisions (such as whether to petition to revoke "probation") and to make case-related decisions (such as whether someone is eligible for "probation") and to present and testify about the facts relevant to enforcement decisions (such as whether the person committed violations of "probation");

- Whether the City can place people on "probation" subject to liberty constraining conditions based solely on their wealth status and immediate ability to pay fines, fees, costs, and surcharges;

- Whether the City can arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt;

- Whether the City can imprison people using "fines or days" orders without informing people of a right to appeal and then condition any appeal of its orders on the payment of an "appellate bond" of $500 per traffic ticket without informing people of their right to have the payment waived if they are indigent and without waiving the fee on a showing of indigence.

173. These common legal and factual questions arise from one central scheme and set of policies and practices: the City's enormously profitable traffic debt collection system. The City operates this scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

**C.    Typicality. Fed. R. Civ. P. 23(a)(3).**

174. The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interests in this case as all other members of the Classes that they represent. Each of them suffered injuries from the failure of the City to comply with the basic constitutional provisions detailed below. The answer to whether the City's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

175.    If the named Plaintiffs succeed in their claims that the City's policies and practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes, as well as the Damages Subclasses.[13]

**D.    Adequacy.  Fed. R. Civ. P. 23(a)(4).**

176.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

177.    Plaintiffs are represented by attorneys from Equal Justice Under Law[14] who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the City's scheme and the relevant constitutional and statutory law.

178.    Counsel's efforts have so far included extensive investigation over a period of months, including numerous interviews with witnesses, City employees, City jail inmates, families, attorneys practicing in Montgomery Municipal Court and Montgomery County Circuit Court, community members, statewide experts in the functioning of Alabama municipal courts, and national experts in debt collection, bankruptcy law, forced labor, and constitutional law.

179.    Counsel has also observed numerous courtroom hearings in the City of

---

[13] The named Plaintiffs representing the Declaratory and Injunctive Class are: Sharnalle Mitchell, Lorenzo Brown, Tito Williams, Willie Williams, Tequila Ballard, Thomas Ellis, Tamara Dudley, and Demetri Colvin.  The named Plaintiffs representing the Damages Class are Sharnalle Mitchell, Lorenzo Brown, Courtney Tubbs, Tito Williams, Tequila Ballard, Willie Williams, Thomas Ellis, Gavin Bullock, Kendrick Maull, Tamara Dudley, Jermaine Tyler, Janet Edwards, Risko McDaniel, Demetri Colvin, Carl Williams, and Rayshone Williams.  The named Plaintiffs representing the Jail Labor Subclass are: Sharnalle Mitchell, Tito Williams, Tequila Ballard, Willie Williams, Janet Edwards, and Rayshone Williams.  The named Plaintiffs representing the "Probation" Subclass are: Sharnalle Mitchell, Lorenzo Brown, Tequila Ballard, and Gavin Bullock.

[14] Equal Justice Under Law is a non-profit civil rights organization based in Washington, D.C.  The organization was founded and is run by Alec Karakatsanis and Phil Telfeyan, and it is funded in part by the Harvard Law School Public Service Venture Fund.

Montgomery and in cities across Alabama in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel has studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

180.    As a result, counsel has devoted enormous time and resources to becoming intimately familiar with the City's scheme and with all of the relevant state and federal laws and procedures that can and should govern it.   Counsel has also developed relationships with many of the individuals and families most victimized by the City's practices.

181.    Counsel for Plaintiffs has also been a lead attorney in a recent constitutional civil rights class action suit against the District of Columbia in the United States District Court for the District of Columbia.  *See* 1:13-cv-00686-ESH (D.D.C. 2013).  As part of that litigation, counsel for the Plaintiffs was responsible for investigating and building the legal claims, authoring the legal filings in the class action case, and negotiating a Memorandum of Understanding with the District of Columbia Attorney General that stayed the class action and began to implement sweeping changes to the District of Columbia's policies and practices governing the civil forfeiture of property by the District's Metropolitan Police Department—procedures that affect thousands of putative class members every year.

182.    Plaintiffs are also represented by multiple local counsel,[15] who have similarly devoted significant time and resources to investigating the City's policies and practices, including observing court proceedings, conducting numerous interviews, reviewing City documents, contracts, and policies, and representing indigent-debtor inmates in emergency proceedings to secure their release from the City jail.

---

[15] Local counsel are Matthew Swerdlin, owner of Matthew Swerdlin, Attorney at Law, in Birmingham, and J. Mitch McGuire, Managing Partner of McGuire & Associates, in Montgomery.

183.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

E.      **Rule 23(b)(2)**

184.    Class action status is appropriate because the City, through the policies, practices, and procedures that make up its traffic debt-collection scheme, has acted and/or refused to act on grounds generally applicable to the Declaratory and Injunctive Class.  Thus, a declaration that people in the City are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the City for non-payment will apply to each Class member.  The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at a hearing initiated and litigated by City prosecutors and at which they are jailed; that Class members are entitled to judicial proceedings concerning whether to put them on probation or whether to revoke their probation free of the influence of a probation officer with a financial stake in the proceedings; that the City cannot imprison Class members for debts and then coerce them into working for the City as jailed janitors to reduce their debts by $25 per day; that the City cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; that the City cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty; and that the City must inform people that it jails of their appellate rights and cannot condition appeal of its orders jailing people for non-payment on the payment of an appellate bond.

185.    Injunctive relief compelling the City to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the City's

unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

       **F:**     **Rule 23(b)(3)**

     186.     Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.  This case turns, for every Plaintiff, on what the City's policies and practices are and on whether those policies are lawful.

     187.     The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the City's policies and practices than individual suits by hundreds or thousands of City residents.  The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the City jail.  To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.  If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

     188.     Plaintiffs seek the following relief and hereby demand a jury in this cause for all matters so appropriate.

## Claims for Relief

**Count One:  Defendant City of Montgomery Violated Plaintiffs' Rights By Jailing Them For Non-Payment of Debts Without Any Inquiry Into Their Inability To Pay the City.**

189.    Plaintiffs incorporate by reference the allegations in paragraphs 1-188.

190.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is unable to pay and without following basic procedures to make that determination. Defendant violated Plaintiffs' rights by imprisoning them when they could not afford to pay the debt allegedly owed and without following the basic constitutional process required.

191.    Defendant violated Plaintiffs' rights by jailing them, and by threatening to jail them, without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment as required by the United States Constitution.  The City similarly did not provide the required notice to the Plaintiffs concerning the relevant issues at any hearing contemplating their imprisonment, provide a meaningful opportunity for Plaintiffs to present evidence of their inability to pay, or make findings concerning their ability to pay.

192.    Defendant's policy and practice of imprisoning people when they cannot afford to pay their debt and of automatically converting monetary fines into days in jail at a rate of $50 per day violates the due process and equal protection provisions of the United States Constitution.

**Count Two: Defendant City of Montgomery Violated Plaintiffs' Rights By Imprisoning Them For Inability To Pay Debts Without Appointing Adequate Counsel.**

193.    Plaintiffs incorporate by reference the allegations in paragraphs 1-192.

194.    Defendant violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by imprisoning Plaintiffs

during proceedings litigated by City prosecutors at which Plaintiffs did not have the benefit of adequate counsel and did not knowingly, intelligently, and voluntarily waive counsel.

195.    The City's policy of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned in the City jail for unpaid debts, which are, in turn, based on traffic violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

**Count Three: Defendant City of Montgomery's Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings and Case Decisions As a Supposedly Neutral Probation Official Violates Plaintiffs' Due Process Rights.**

196.    Plaintiffs incorporate by reference the allegations in paragraphs 1-195 above.

197.    The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by the government.  The City has contracted with a private, for-profit corporation to perform a traditional court function—probation—and made the resolution of Plaintiffs' cases contingent on the advice, recommendations, discretionary decisions, enforcement actions, and representations of this private entity.

198.    Because this non-neutral actor profits significantly from the decisions about whether to place people on probation, what conditions to require, and how vigorously to enforce those conditions, there is a possibility that those financial interests will affect its judgment when it participates in those decisions.  Because this private entity has a significant personal financial interest in how these cases are resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the City's policies and practices violate the longstanding due process restrictions against such self-interested arrangements in American courts of justice.

**Count Four: Defendant City of Montgomery's Scheme of Forcing Indigent Prisoners to Labor in the City Jail in Order to Work Off Their City Debts Violates the Thirteenth Amendment to the United States Constitution and Federal Law.**

199.    Plaintiffs incorporate by reference the allegations in paragraphs 1-198 above.

200.    The City unlawfully imprisoned Plaintiffs for a monetary debt owed to the City. On top of being unlawfully imprisoned for failure to pay debts owed to the City, Plaintiffs were, pursuant to City policy, coerced with longer unlawful jail terms by City officials if they did not "volunteer" to labor in the City jail under disgusting conditions for an extra credit of $25 per day toward their debts. This amounts to peonage and forced labor, whereby a person is coerced by threat of legal sanction—i.e. imprisonment—to work off a debt to a master. It is also an abuse of the legal process that exploited Defendant's unlawful incarceration of Plaintiffs to force them to accept, in their desperation to end their unlawful incarceration more quickly, the conditions of forced labor, performing janitorial tasks that City employees did not want to perform, such as cleaning significant amounts of blood and feces in an overcrowded jail environment.

201.    Plaintiffs allegedly owed the City a monetary debt for traffic tickets and associated fees, costs, and surcharges. Because Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the coerced use of their labor to work off their purely monetary debt. The City's conduct also violates federal statute, including 18 U.S.C. § 1589 (forced labor under threat of physical restraint or abuse of process), § 1593A (benefitting from peonage); and § 1595 (providing a civil remedy).

**Count Five: Defendant City of Montgomery's Use of Jail and Threats of Jail To Collect Debts Owed to the City Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

202.    Plaintiffs incorporate by reference the allegations in paragraphs 1-201 above.

44

203.    The Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  Not only does the City charge additional fees only to those people who cannot afford to pay in full immediately and place such people on "pay only" probation when the cases of wealthier people would be closed, but by imposing jail, threats of jail, indeterminate "probation," invalid license suspensions, and other restrictions on Plaintiffs, the City takes advantage of its control over the machinery of the City jail and police systems to deny debtors the statutory protections that every other Alabama debtor may invoke against a private creditor.  This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Six: Defendant City of Montgomery's Policy and Practice of Placing People Who Owe Debts to the City on Probation Based Solely on Their Wealth Status Violates the Fourteenth Amendment.**

204.    Plaintiffs incorporate by reference the allegations in paragraphs 1-203 above.

205.    The City's policy and practice is to ask whether a person can pay the entirety of any fines, fees, costs, and surcharges immediately.  If the person can pay, the person pays and the case is closed.  If the person is too poor to pay, the City has a practice of placing that person on "probation," including forcing the person to abide by conditions that restrict the person's liberty and that purport to subject the person to punishment if those conditions (including payment of extra fees) are violated.   This policy and practice of altering punishment based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

**Count Seven: Defendant City of Montgomery's Policy and Practice of Issuing and Serving Warrants Solely Based on Nonpayment of Monetary Debts Violates the Fourth and Fourteenth Amendments.**

45

206.    Plaintiffs incorporate by reference the allegations in paragraphs 1-205 above.

207.    The City's policy and practice is to issue and serve warrants at the homes of those who have not paid their traffic debt.  These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the City has advance knowledge that the person is impoverished and unable to pay the debts.  These warrants are sought, issued, and served without any finding of probable cause that the person has committed any offense.  The City chooses to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court.  The City policy and practice is to deprive people of their liberty without any prior notice and hearing or any basic inquiry into whether the debt is still owed or valid.  As in the case of Mr. Brown and other named Plaintiffs, the City often chooses to serve these warrants prior to or over a weekend so that a person can spend, as did Mr. Brown, up to three full days in the City jail prior to the next court session, a practice designed to increase the time a person spends in jail and that is arbitrary and without justification for a delay.  These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

**Count Eight: Defendant City of Montgomery's Policy and Practice of Requiring a Costly "Appeal Bond" for Indigent People Without Conducting a Meaningful Inquiry Into Their Ability to Pay Violates Due Process and Equal Protection.**

208.    Plaintiffs incorporate by reference the allegations in paragraphs 1-207 above.

209.    When Plaintiffs Ms. Mitchell and Mr. Brown attempted, through counsel, to file an emergency appeal of the order imprisoning them for owing the City a monetary debt, the City followed its policy of attempting to bar inmate appeals unless the Plaintiffs paid to the City a total of $9,000 and $5,000 respectively, significantly more than the amount either owed to the

City, which Plaintiffs were already unable to afford—a fact of poverty that led to their illegal incarceration in the first place.

210.    Pursuant to City policy and practice, the named Plaintiffs were never even informed of any right to an appeal of the order putting them in jail for unpaid debt or their right to have the costs associated with pursuing an appeal waived if they are indigent.

211.    This policy of charging appeal bonds to those who cannot afford them, which a previous decision from this Court held unconstitutional, as well as the practice of not informing inmate debtors of their rights concerning appeal, including the right to have such costs waived, violates the due process and equal protection rights secured by the Fourteenth Amendment.

## **Request for Relief**

WHEREFORE, Plaintiffs request that this Court issue the following relief:

a.  A declaratory judgment that the Defendant City violated Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

b.  A declaratory judgment that Defendant violated Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without providing adequate counsel to represent them at the judicial proceeding that led to their incarceration;

c.  A declaratory judgment that Defendant violated Plaintiffs' rights by employing and relying on a non-neutral "probation" officer who has a significant personal financial stake in the outcome of Plaintiffs' judicial proceedings;

d.  A declaratory judgment that the City violated Plaintiffs' constitutional and statutory rights by coercing them into performing labor in its jail in order to work off their debts;

e.  A declaratory judgment that Defendant violated Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

f.  A declaratory judgment that Defendant violated Plaintiffs' Fourteenth Amendment rights by placing them on "probation" based solely on their wealth status;

g.  A declaratory judgment that Defendant violated Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to the City;

h.  A declaratory judgment that Defendant violated Plaintiffs' due process and equal protection rights by not informing them of their appeal rights, including charging Plaintiffs appeal bonds on which the right to pursue an appeal was purportedly contingent

without informing them of their right to have that amount waived if they could not afford it;

i. An order and judgment preliminarily and permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs and the Class of similarly situated people that they represent;

j. A judgment compensating the Plaintiffs and the Class of similarly situated people that they represent for the damages that they suffered as a result of the City's unconstitutional and unlawful conduct;

k. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Respectfully submitted,

 _/s/Matthew Swerdlin_____
Matthew Swerdlin (ASB-9090-M74S)

Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road #101
Birmingham, AL 35209
(205)-793-3517
matt@attorneyswerdlin.com

 _/s/ J. Mitch McGuire_____
J. Mitch McGuire (ASB-8317-S69M)

Managing Partner
McGuire & Associates, LLC
31 Clayton Street
Montgomery, AL 36104
(334)-517-1000
http://www.mandabusinesslaw.com

 _/s/ Alec Karakatsanis_____
Alec Karakatsanis (D.C. Bar No. 999294)
(Admitted  *Pro Hac Vice*)

Co-Founder
Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org

*Attorneys for Plaintiffs*

48

**CERTIFICATE OF SERVICE**

I hereby certify that foregoing has been served upon the following by electronic filing and notification through the U.S. District Court for the Middle District of Alabama CM/ECF system, this 23rd day of May, 2014:

Stephanie L. Smithee
Attorney for City of Montgomery
City of Montgomery Legal Department
Post Office Box 1111
Montgomery, Alabama 36101-1111
ssmithee@montgomeryal.gov

Shannon L. Holliday
Copeland Franco Screws & Gill, P.A.
Post Office Box 347
Montgomery, AL 36101
holliday@copelandfranco.com
(334)-834-1180

Robert D. Segall
Copeland Franco Screws & Gill, P.A.
Post Office Box 347
Montgomery, AL 36101
(334)-834-1180
segall@copelandfranco.com


                                    __/s/ Alec Karakatsanis_____


                                    Equal Justice Under Law
                                    916 G Street, NW Suite 701
                                    Washington, DC 20001
                                    (202)-681-2409
                                    alec@equaljusticeunderlaw.org